UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION


CHELSAE R. WESSELS,          *
                            *
          Plaintiff,         *
                            *
v.                          *    CIVIL NO. SA-16-CA-00297-FB
                            *
BSZ MEDICAL PA and BENJAMIN  *
ZERTUCHE,                    *
                            *
          Defendants.        *


## MEMORANDUM AND RECOMMENDATION

Plaintiff, Chelsae R. Wessels, instituted this lawsuit against defendants BSZ Medical, PA and Benjamin Zertuche (collectively "BSZ Medical") under the Fair Labor Standards Act ("FLSA"). Wessels alleges she was not paid a "discernable wage for any hours worked and was not paid the mandated one and one-half rate required by law." (Docket no. 1, p. 4). She contends that BSZ Medical knowingly and willfully disregarded the provisions of the FLSA. Wessels seeks an amount equal to all of her unpaid minimum wages and overtime wages as liquidated damages. She has filed a motion for summary judgment (docket nos. 27, 31), to which motion BSZ Medical has responded. (Docket no. 30). The motion should be denied.

## Summary Judgment

Summary judgment shall be rendered if the movant shows that "there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law." **Rule 56(a), Fed.R.Civ.P.** The plain language of this rule mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In such a situation, there can be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. *Id*. at 322-23. The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

A summary judgment movant or opponent must cite to materials in the record or show that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact. **Rule 56(c)(1), Fed.R.Civ.P.** An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to

testify to the matters stated. **Rule 56(c)(4), Fed.R.Civ.P.** If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact, as required by Rule 56(c), the Court may grant summary judgment if the motion and supporting materials show that the movant is entitled to it. **Rule 56(e), Fed.R.Civ.P.** In ruling upon a motion for summary judgment, a court must view the evidence in the light most favorable to the opposing party and all justifiable inferences are to be drawn in his favor. ***Tolan v. Cotton***, 572 U.S. ---, 134 S.Ct. 1861, 1866, 188 L.Ed.2d 895 (2014); ***Anderson***, 477 U.S. at 255.

## Summary Judgment Evidence

In her motion for summary judgment, Wessels contends that the primary issue to be decided is whether she was an employee of BSZ Medical during the relevant time period. As noted in a prior Court Order, BSZ Medical denies that Wessels was an employee. BSZ refused to produce any discovery related to any request which assumed an employment relationship between Wessels and BSZ Medical. (Docket no. 27, exh. 16).

In her Declaration, Wessels testifies that she worked for Dr. Benjamin Zertuche at BSZ Medical, PA as a data entry specialist and an administrative assistant. (Docket no. 27, exh. 5). She began working for Dr. Zertuche at the Atascosa Health Center in 2009 and transitioned to work for him at BSZ

3

Medical until her employment ended on March 31, 2014.  During her employment with Dr. Zertuche he was married to Jean Zertuche who became aware that Dr. Zertuche was having an affair with Wessels.  According to Wessels, Dr. Zertuche convinced her to continue to work for him, and to keep her employment a secret from Jean Zertuche.

Measures were taken to hide Wessels employment from Jean Zertuche.  For example, Wessels only worked in the medical office with other staff when Jean Zertuche was out of town, on vacation, during the holidays, or after hours.  Wessels asserts she worked out of a home office or other offices off-site from BSZ Medical, including (a) Dr. Ricardo Montemayor's office in Jourdanton, Texas at the South Texas Regional Hospital; (b) in the physician medical records office in Jourdanton, Texas at the South Texas Regional Hospital; (c) the Zertuche's second home located in Jourdanton on Nopal Street; (d) the Zertuche's vacation home located on Medina Lake in Pipe Creek, Texas; (e) the Holiday Inn Hotel located in Jourdanton, Texas by South Texas Regional Hospital; (f) her primary residence located in San Antonio, Texas; or (g) her secondary residence located in Jourdanton, Texas.

Wessels declares that Dr. Zertuche assigned her vague email addresses, usernames and passwords for her access to all BSZ

Medical work logins.  Her Practice Fusion[1] logins were also vague, and variations on common words such as "administrator," "data entry," "exam," and "lab" or a variation of the office name.  She was also told by Dr. Zertuche to use his login and other staff's logins so that when she did an extensive amount of work he could say it was another staff member.  Office staff was instructed to always contact Wessels at the administrator login in the Practice Fusion Electronic Health Records or on the generic office email assigned to Wessels so that Dr. Zertuche could say that it was his office manager, Deborah Bermea.

Wessels testifies that she performed various office tasks for Dr. Zertuche on a daily, weekly, and monthly basis, as needed.  Some of those tasks included:

a.  Scheduling BSZ Medical office meetings with DME companies, home health companies, hospice companies, pharmaceutical reps, nursing homes, and hospitals;

b.  Data entry of shorthand notes, vitals, past medical history, medications, and diagnosis from BSZ Medical patient office visits and nursing home visits;

c.  Patient insurance verification;

d.  Patient narcotic monitoring;

e.  Clinic equipment and medical supply ordering;

---

[1] As noted in a prior Order, Practice Fusion is a software database.

f. Tracking and monitoring BSZ Medical employee time worked and time off;

g. BSZ Medical employee interviews and resume review for potential hires;

h. BSZ Medical payroll setup and processing;

i. BSZ employee file maintenance;

j. Prepare BSZ Medical monthly meeting agendas;

k. Record keeping for BSZ Medical physician payments;

l. Scheduling nursing home nurse practitioner visits; track nurse practitioner monthly encounters for all clinic and nursing home visits;

m. Patient referral processing, follow up and employee count for hospice, home health, DME and Specialists referrals;

n. BSZ Medical patient records requests processing, patient records request invoice creation and processing;

o. BSZ Medical invoice payments and reconciliation;

p. BSZ Medical forms creation and editing;

q. BSZ Medical patient and nursing home after hours on call, return calls and follow up;

r. BSZ Medical and Dr. Zertuche patient house call visit processing and file maintenance;

s. BSZ Medical and Dr. Zertuche's provider prescription pad ordering and nursing home patient prescription delivering;

t.  Dr. Zertuche's continuing education monitoring and tracking, continuing education trip planning, continuing education travel, trip expense reimbursement tracking, monitoring, and submission;

u.  Schedule Dr. Zertuche's hospice monthly meetings and visits;

v.  Dr. Zertuche's Hospice invoice preparation and invoice processing;

w.  Scheduling Dr. Zertuche's home health meetings and visits;

x.  Dr. Zertuche's nursing home invoice preparation and invoice processing;

y.  Scheduling Dr. Zertuche's nursing home monthly meetings and visits;

z.  Dr. Zertuche's nursing home invoice preparation and invoice processing;

aa. Dr. Zertuche's hospital scheduling;

bb. Dr. Zertuche's hospital invoice preparation and invoice processing;

cc. Dr. Zertuche's hospital chart review and signing;

dd. Dr. Zertuche's patient medication refills with the pharmacy and in Practice Fusion; and,

ee. Dr. Zertuche's patient email responses.

According to Wessels, Dr. Zertuche required her to not only work weekdays before and after clinic hours but weekends and holidays. Dr. Zertuche would often instruct staff to drop off paperwork at Wessels' house. Dr. Zertuche went to her house before work, during lunch, or after work and would bring her BSZ Medical clinic paperwork or leave it for Wessels to complete. He would then either pick it up, have Wessels drop it off to the office once it was completed after hours or instruct his other office staff to pick it up. Dr. Zertuche gave Wessels full access to his clinic by providing her with a set of office keys and alarm security codes so she could work in the clinic after hours. Dr. Zertuche himself assigned all BSZ Medical work tasks to Wessels as he was her only supervisor.

Wessels avers that she often asked Dr. Zertuche to put her on the payroll because, at the end of her employment, more than a year passed without paying her. He indicated he would do so after his divorce was finalized and would pay Wessels all back pay and overtime but he never did. When Wessels ended her personal relationship with Dr. Zertuche, he fired her. On March 31, 2014, Dr. Zertuche sent Wessels an e-mail terminating her employment with BSZ Medical. (Docket no. 27, exh. 6). On the same day, he sent her an e-mail asking Wessels to provide him information on patient chart reviews, information on how to access all the BSZ Medical email accounts and the password for

the BSZ Medical administrator email account that Wessels was assigned to use.  (Id., exh. 7).  On April 6, 2014, Wessels sent an e-mail to Crystal Bautista, Deborah Bermea and Dr. Zertuche providing the information requested by Dr. Zertuche.  (Id., exh. 11).

Christy Cantu testified that she worked for BSZ Medical and Dr. Zertuche as a clinical supervisor from 2011 through 2014. (Docket no. 27, exh. 4).  While working there, she worked with Chelsae Wessels.   Dr. Zertuche would often instruct Cantu verbally or through emails to send or give Wessels records or documents, such as patient medical documents or patient information.  Cantu interacted with Wessels via e-mail, phone calls, faxes, text messages, and face-to-face regarding business and patient matters.  These interactions included providing her what she needed to refill or change prescriptions for patients, contact patients with their results, and put patient information including notes and vitals into the BSZ Medical patient database.

According to Cantu, on a daily basis, Wessels would assure that the patient flow was running smoothly in the office, and that the documents being used for the patients were current. Cantu avers that Wessels worked very late hours for BSZ Medical and was a very devoted employee.  Cantu was included on the email that Dr. Zertuche sent terminating Wessels from BSZ

9

Medical, and the staff was instructed to have no further contact with her regarding the business.

In a deposition taken July 20, 2015 in his state court divorce proceedings, Dr. Zertuche testified:

Q. Okay. And you told me your affair with Chelsae Wessels began in 2009; is that correct?

A. That is correct.

Q. And she was married at the time your affair began, correct?

A. Correct.

Q. Okay. Was she employed by you when you began your affair with her?

A. No.

Q. Did she work for you from 2008 to 2014?

A. Informally.

Q. Informally?

A. Yes.

Q. Okay. She was not on BSZ's Medical payroll?

A. No, sir.

Q. Why not?

A. Because I was married to Jean at the time.

Q. And that was a way that you could conceal your affair with Chelsae from Jean, correct?

A. That's correct.

(Docket no. 27, exh. 1).

The only controverting summary judgment submitted by BSZ Medical is the Declaration of Dr. Zertuche.[2]  He testifies that, in 2010, he and Wessels decided to open an assisted-care facility in Lytle, at a location previously owned and operated by Wessels' grandparents.  He refers to the assisted care facility as the Country Life Facility.  Dr. Zertuche states that in order to do so, he and Wessels entered into an oral partnership to equally share the losses and the profits of the endeavor.  Because he and Wessels were having an extra-marital affair, "special care was taken in the operation of our partnership."

Dr. Zertuche and Wessels formed a limited liability company in June 2010 known as CRZ Healthcare, LLC ("CRZ"), which was solely funded by Dr. Zertuche, and owned in equal shares by Wessels and Dr. Zertuche.  In August 2010, they  formed another limited liability corporation in August 2010 known as CRS Healthcare, LLC ("CRS").  Wessels is the only member and manager of CRS.  Between June of 2010 and August of 2013, Dr. Zertuche transferred over $729,000 to CRZ.  Some of that money was then transferred by Wessels to CRS to service CRS's debt and pay expenses.  They agreed that $250,000 of the money was to be used to pay operating expenses of the partnership, including Wessels'

---

[2] Plaintiff's objections to portions of the Declaration are overruled.

salary at CRS. During that time period, Dr. Zertuche was involved in the operations of the Country Life Facility, both as the medical director and because the patients he referred to Country Life were the main source of revenue for CRS, to pay Wessels' salary. He was present at the facility on a regular basis and generally monitored income and expenses.

Dr. Zertuche and Wessels agreed that CRS would employ Wessels, and she would be paid out of the money he transferred and income generated by Country Life Facility. They also both knew that CRS would be dependent on Dr. Zertuche and BSZ Medical Clinic to be successful, as Dr. Zertuche was the biggest referring doctor to the Country Life Facility and the Medical Director. Accordingly, Dr. Zertuche and Wessels agreed that she would, on an informal basis, perform services for BSZ Medical Clinic, which would ultimately benefit the Country Life Facility. Dr. Zertuche states that is what he meant when he testified in his state court deposition that Wessels was an "informal" employee of the BSZ Medical Clinic.

Dr. Zertuche testifies that Wessels was never paid by the BSZ Medical Clinic. According to Dr. Zertuche she never reported to him or anyone else at the BSZ Medical Clinic for work, nor did she have any formal employment relationship with the BSZ Medical Clinic. Wessels was never on the payroll of BSZ Medical Clinic. While Dr. Zertuche is a partner in CRS, he did

not believe he had the power to hire or fire Wessels. According
to Dr. Zertuche, that is why the March 31, 2014 e-mail severing
their relationship did not tell Wessels she was fired, but told
her that she could no longer be involved in the operations of
the BSZ Medical Clinic.

Dr. Zertuche asserts that he and Wessels are currently
involved in a state court lawsuit over the ownership and
operation of the Country Life Facility. She contends he has no
ownership in the Country Life Facility. Dr. Zertuche testifies
that Wessels told him she was paying herself out of CRS and that
she was paying taxes on those amounts. He avers that during the
time that she claims that she was employed by BSZ Medical
Clinic, she was being paid by CRS to do the very same work.
Based on his review of Wessels' submission of hours worked for
the BSZ Medical Clinic, and the fact that she was working as a
full-time employee of the Country Life during the same time
period, it would be physically impossible for her to perform
both jobs.

According to Dr. Zertuche, he could have put Wessels on the
payroll either after his wife discovered the affair or after his
wife filed for divorce. In deciding not to put Wessels on the
payroll of BSZ Medical Clinic, Dr. Zertuche depended on Wessels'
statements that she was being paid by CRS and would keep payroll
records. Despite what Wessels claims now, she never told him

that she was expecting back pay or overtime from BSZ Medical Clinic. It was always both Dr. Zertuche's intention and understanding that Wessels would be paid by CRS for any tasks she performed which may have benefitted BSZ Medical Clinic.

Dr. Zertuche testifies that during 2013 and 2014, Wessels, as the "owner" of CRS had the power to determine whether or not she devoted time to the affairs of BSZ Medical Clinic. She supervised and controlled her own work schedules. She decided when and if she devoted time to BSZ Medical Clinic. During the time she alleges that she was a full time employee of BSZ Medical Clinic, she maintained an office at Country Life from which she worked full time on the operation of the Country Life Facility. She is the one that determined the amount of pay that she received, when she received it, and she determined the method of payment. They agreed that Wessels would maintain the employment records for CRS. Dr. Zertuche states that he did not even know that Wessels claimed to be an employee of BSZ Medical Clinic.

## Analysis

Title 29 U.S.C. § 206(a) provides for the payment by an employer to its employee a minimum hourly wage of $7.25. Also, no employer shall employ any employee for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of 40 hours at a rate not less than one and

one-half times the regular rate at which she is employed. **29 U.S.C. § 207(a)(1).** Any employer who violates the provisions of §§ 206 or 207 shall be liable to the employee affected in the amount of unpaid minimum wages, or unpaid overtime compensation, and in an additional equal amount as liquidated damages. **29 U.S.C. § 216(b).** An "employer" includes any person acting directly or indirectly in the interest of an employer in relation to an employee, while the term "employee" means any individual employed by an employer. **29 U.S.C. § 203(d), (e)(1).**

Our Court of Appeals relies on the economic reality test when determining a party's status as an employer under the FLSA. ***Orozco v. Plackis***, 757 F.3d 445, 448 (5th Cir. 2014). Under the economic reality test, courts evaluate "whether the alleged employer: (1) possessed the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records." ***Id.*** (*quoting **Gray v. Powers***, 673 F.3d 352, 355 (5th Cir. 2012)). However, a party need not establish each element in every case. ***Orozco***, 757 F.3d at 448. "The dominant theme in the case law is that those who have operating control over employees within companies may be individually liable for FLSA violations committed by the companies." ***Id.*** (*quoting **Martin v. Spring Break '83 Prods., LLC***, 688 F.3d 247, 251 (5th Cir. 2012)).

Moreover, "[t]he remedial purposes of the FLSA require the courts to define 'employer' more broadly than the term would be interpreted in traditional common law applications." *Id.* (*quoting* **McLaughlin v. Seafood, Inc.**, 867 F.2d 875, 877 (5th Cir. 1989), *modifying* 861 F.2d 450 (5th Cir. 1988)).

The Court finds the record replete with genuine issues of material fact that preclude entry of summary judgment. Clearly, the working relationship between Wessels and BSZ Medical possesses none of the ordinary attributes, e.g., application for employment, hire date, agreement as to pay, pay stubs, working hours, place of employment, periodic pay increases, etc. Nevertheless, Wessels' summary judgment evidence suggests that an employment relationship existed. Wessels asserts she worked for Dr. Zertuche at BSZ Medical as a data entry specialist and an administrative assistant. She states her employment was kept secret because of her affair with Dr. Zertuche. For that reason, many of the normal indicators of an employer-employee relationship do not exist. Wessels worked out of different offices and used different e-mail addresses. Yet, in her complaint, Wessels alleges she was not paid a "discernable wage for any hours worked ..." As defendants question in their response, the Court finds a genuine issue of fact concerning Wessels' willingness to provide services to defendants for over five years without pay.

16

Wessels asserts that Dr. Zertuche required her to not only work weekdays before and after clinic hours but weekends and holidays.   On the other hand, Dr. Zertuche testifies that during 2013 and 2014, Wessels, as the "owner" of CRS had the power to determine whether or not she devoted time to the affairs of BSZ Medical Clinic.   She supervised and controlled her own work schedules.   She decided when and if she devoted time to BSZ Medical Clinic.   Wessels testifies that she performed various office tasks for Dr. Zertuche on a daily, weekly, and monthly basis, as needed.   However, Dr. Zertuche avers that during the time that she claims that she was employed by BSZ Medical Clinic, she was being paid by CRS to do the very same work. They dispute whether Wessels asked Dr. Zertuche to put her on the BSZ Medical payroll.

In both her motion for summary judgment and her reply, Wessels chose not to address CRZ, CRS, Country Life Facility, the state court lawsuit or their relationship, if any, to her employment status with BSZ Medical.   She has not disputed their existence or their relevance to her claims.   In her complaint, Wessels alleges, "Defendant Benjamin Zertuche chose to deposit inconsistent and arbitrary amounts into an account belonging to a corporate entity and controlled by Plaintiff and Defendant, for purposes unrelated to her work."   (Docket no. 1, p. 4).   Dr. Zertuche attests that the money was directly related to her

work.   Thus, questions exist as to whether (1) Wessels was employed by BSZ Medical, as she claims, or (2) she was employed by CRS as Dr. Zertuche claims, and was paid out of the money he transferred and income generated by Country Life Facility, or (3) she was employed to some extent by both.

The summary judgment evidence submitted by Wessels, i.e., the March 31, 2014 termination e-mail, Cantu testimony, and the April 6, 2014 e-mail from Wessels to Crystal Bautista, Deborah Bermea and Dr. Zertuche arguably support each of the theories. Similarly, the fact that Dr. Zertuche or his staff took BSZ Medical paperwork to Wessels' home and Wessels had full access to his clinic does not preclude the overlap of services for BSZ Medical and Country Life Facility.   In light of this competing evidence, a jury must determine what Dr. Zertuche meant when he testified in his state court deposition that Wessels was an "informal" employee of the BSZ Medical Clinic.   Assuming Wessels was an employee of Dr. Zertuche or BSZ Medical, a jury will need to determine how much, if any, she has been paid for her services through money provided to CRS.

## RECOMMENDATION

It is the recommendation of the Magistrate Judge that the motion of plaintiff for summary judgment be **DENIED**.

<u>Instructions for Service and</u>
<u>Notice of Right to Object</u>

The District Clerk shall serve a copy of this Memorandum and Recommendation on all parties either electronically or by mailing a copy by certified mail, return receipt requested. Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b)(2), Fed.R.Civ.P., any party who desires to object to this Memorandum and Recommendation must serve and file specific written objections within 14 days after being served with a copy. Such party shall file the objections with the District Clerk and serve the objections on all other parties and the Magistrate Judge. A party's failure to file written objections to the findings, conclusions, and recommendations contained in this report within 14 days after being served with a copy shall bar that party from de novo review by the District Judge of those findings, conclusions, and recommendations and, except on grounds of plain error, from appellate review of factual findings and legal conclusions to which the party did not object, which were accepted and adopted by the District Court. *Thomas v. Arn*, 474 U.S. 140, 150 (1985); *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996).

**SIGNED** June 20, 2017.

_____
JOHN W. PRIMOMO
UNITED STATES MAGISTRATE JUDGE